# Exhibit A

IN THE SUPERIOR COURT OF BARTOW COUNTY
STATE OF GEORGIA

**FILED**

JUN 17 2015

CLERK OF SUPERIOR COURT
BARTOW CO., GA

| | |
|---|---|
| CARTERSVILLE MEDICAL CENTER, LLC, d/b/a Cartersville Medical Center, | : |
| Plaintiff, | : |
| v. | : Civil Action File No. 15-CV-868 |
| HUMANA EMPLOYERS HEALTH PLAN OF GEORGIA, INC., and its affiliates accessing the Plaintiff's agreement, | : |
| Defendants. | : |

## SUMMONS

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Robert L. Allgood
ROBERT L. ALLGOOD, P.C.
720 Saint Sebastian Way, Suite 120
Augusta, GA 30901

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _17th_ day of June, 2015.

HON. MELBA SCOGGINS
CLERK OF SUPERIOR COURT
BARTOW COUNTY

By: _____
Deputy Clerk

IN THE SUPERIOR COURT OF BARTOW COUNTY
STATE OF GEORGIA

FILED
JUN 17 2015
CLERK OF SUPERIOR COURT
BARTOW CO., GA

CARTERSVILLE MEDICAL CENTER,
LLC, d/b/a Cartersville Medical Center,

      Plaintiff,

v.

HUMANA EMPLOYERS HEALTH PLAN
OF GEORGIA, INC., and its affiliates
accessing the Plaintiff's agreement,

      Defendants.

Civil Action File No. 15-CV-868

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Cartersville Medical Center, LLC, doing business as Cartersville Medical Center (the "Hospital"), by and through its undersigned counsel, and files this Complaint for Damages against Defendants Humana Employers Health Plan of Georgia, Inc. and its affiliates accessing the Plaintiff's agreement ("Humana"), alleging as follows:

### NATURE OF THE CASE

1. This breach-of-contract dispute arises out of underpayments by Humana for health-care services provided by the Hospital to Humana's Medicare Advantage members. The underpayments by Humana violate the parties' written contract, resulting in damages currently estimated to be well over $100,000, and growing.

2. All of the underpayments stem from a two-percent reduction in payments that Humana implemented unilaterally, starting on or about April 1, 2013. Humana contends that its contract with the Hospital allows Humana to reduce its payments to the Hospital if the Federal Government invokes a budgetary device known as "sequestration" to reduce the amount of

1186577.5

money the government pays Humana. The contract between Humana and the Hospital grants Humana no such right.

## PARTIES, JURISDICTION, AND VENUE

3. Plaintiff Cartersville Medical Center, LLC, doing business as Cartersville Medical Center, is a Georgia limited liability company with its principal place of business at 960 Joe Frank Harris Parkway, Cartersville, Georgia 30120.

4. Defendant Humana Employers Health Plan of Georgia, Inc. is a Georgia corporation with its principal place of business at 1200 Ashwood Parkway, Suite 250, Atlanta, Georgia 30338. Humana may be served with process through its registered agent, Corporation Service Company, 40 Technology Parkway, South Suite 300, Norcross, Georgia 30092. Humana provides health coverage in all states, including Georgia.

5. Jurisdiction and venue are proper in this Court because many of the acts and omissions at issue occurred in Bartow County, and because the contract between the parties expressly provides that venue for any court action regarding the contract shall lie in Bartow County, which is where the Hospital is located.

## BACKGROUND AND FACTUAL ALLEGATIONS

### The Parties' Medicare Advantage Agreement

6. On July 1, 2005, and as amended thereafter, the Hospital and Humana entered into a written Medicare Advantage Agreement (the "Agreement"), pursuant to which the Hospital agreed to provide healthcare services to Humana's Medicare Advantage members. Humana, in turn, agreed to pay the Hospital for those services at specified rates. On September 1, 2010 the

Hospital and Humana entered into an Amendment setting forth agreed upon Medicare Advantage reimbursement rates in the attached Hospital Reimbursement Attachment.

7. The Agreement, as amended, contains no language authorizing Humana to unilaterally reduce payments to the Hospital if the government reduces the amount of money it pays Humana as a consequence of sequester. Similarly, the Agreement, as amended, contains no language authorizing the Hospital to demand additional payment from Humana if the government increases the amount of money it pays Humana.

## CMS's Medicare Payment Methodologies

8. The Medicare Act, 42 U.S.C. §§ 1395 to 1395kkk-1, establishes a collection of federal payment systems for medical items and services provided to elderly and disabled individuals, the ability of which is dependent on both the service and type of Medicare provider. The Secretary of Health and Human Services ("Secretary") is charged with administering the Medicare Act. § 1395kk(a). The Secretary has delegated that function to CMS, which is a sub-agency within the Department of Health and Human Services. *See* Statement of Organization, 66 Fed. Reg. 35,437 (July 5, 2001).

9. Medicare in its current form is composed of several different programs administered by CMS. Each program is commonly known as a "Part" in reference to the statutory structure of the Medicare Act. These Parts include:

    a. Part A covers inpatient hospital services compensated directly by the government to providers, pursuant to participation agreements between CMS and the providers;

    b. Part B covers outpatient hospital and Ambulatory Surgery Center ("ASC") services (and other services, such as physician services), that are compensated directly by the government to providers, pursuant to participation agreements between CMS and the providers;

c. Part C, otherwise known as "Medicare Advantage," is a privatized managed-care program whereby the government contracts with health plans such as Humana to assume responsibility for the provision of services that would otherwise be covered under Medicare Parts A and B. Such private health plans assume financial responsibility for Medicare-eligible individuals who opt to enroll with the private health plans. The private health plans, in turn, contract with providers such as the Hospital to create managed-care networks for the delivery of health-care services to Medicare Advantage members; and

d. Part D is a program whereby the government contracts directly with private health plans that, in turn, offer prescription-drug benefits to Medicare-eligible individuals who opt to enroll in those plans.

**The Sequester Law Does Not Authorize Private Health Plans Like Humana to Reduce Payments Owed to Providers Under Medicare Advantage Contracts**

10. The risk of sequestration was a foreseeable event to Medicare Advantage plans, including Humana. The application of sequestration to Medicare programs is not a new concept, and came with plenty of warning.

11. Sequestration was originally established 30 years ago in the Balanced Budget and Emergency Deficit Control Act of 1985, commonly known as the Gramm-Rudman-Hollings Act of 1985 ("GRHA"). Pub. L. No. 99-177, §§ 251–57, 99 Stat. 1037, 1063–93 (codified as amended at 2 U.S.C. §§ 900–907d). The GRHA set deficit-reduction targets for government spending, and established sequestration rules to enforce those targets. GRHA has been amended several times in the past 30 years. *See, e.g.*, Budget Enforcement Act of 1990, Pub. L. No. 101-508, § 13101, 104 Stat. 1388, 1388-574; Statutory Pay-As-You-Go Act of 2010, Pub. L. No. 111-139, tit. I, 124 Stat. 8; Budget Control Act of 2011, Pub. L. No. 112-25, tit. I, 125 Stat. 240;

Sequestration Transparency Act of 2012, Pub. L. No. 112-155, 126 Stat. 1210; and American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313.

12. The current sequestration is not the first to have occurred since GRHA created the sequester concept. Indeed, sequestration took effect on multiple occasions between 1986 and 1990. Moreover, the topic of whether and how to reduce Medicare spending has been a very public and central issue in recent years. Therefore, Humana certainly knew or should have known that sequestration (along with other potential legislative changes) was one of the financial risks it assumed when entering into its capitation arrangement with the government.

13. The current sequestration was established through the Budget Control Act of 2011 ("BCA") and the Sequestration Transparency Act of 2012, and American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313. These Acts amend sections 901a, 905, and 906 of GRHA, and as amended, generally requires the government to implement various spending reductions, including reductions in payments for non-exempt Medicare services.

14. The BCA also makes clear that sequestration cuts are *separate from* the methodologies used by CMS to calculate provider payments. Specifically, the law states that CMS "shall *not* take into account any reductions in payment amounts" under sequestration "for purposes of computing any adjustments to payment rates. . . ." 2 U.S.C. § 906(d)(6) (emphasis added).

15. Although the sequestration law gives the President of the United States discretion over implementation of the spending cuts in many affected programs, no such discretion is provided with respect to Medicare programs. On the contrary, Congress was very specific about how the cuts would occur for different Medicare programs. For services paid under Medicare Parts A and B, the sequester reduces payments made by the government to hospitals, ASCs, and

other providers and suppliers. By contrast, for Medicare Advantage, the sequester reduces the capitation payments made by the government to health plans.

16. Section 901a(9) limits the reductions to Medicare payments to two percent for the duration of sequestration. Sections 905 and 906, in turn, provide certain exemptions from sequestration and special rules regarding the implementation of sequestration. Section 906's special rules for Medicare provide further insight on what Congress's intentions were in this regard. Specifically, § 906(d) provides in relevant part:

> (1) Calculation of reduction in payment amounts
>
> To achieve the total percentage reduction in those programs required by section 902 or 903 of this title, subject to paragraph (2), and notwithstanding section 710 of the Social Security Act [42 U.S.C. § 911], [the Office of Management and Budget ("OMB")] shall determine, and the applicable Presidential order under section 904 of this title shall implement, the percentage reduction that shall apply, with respect to the health insurance programs under title XVIII of the Social Security Act [42 U.S.C. §§ 1395 to 1395kkk]—
>
> > (A) in the case of parts A and B of such title, to individual payments for services furnished during the one-year period beginning on the first day of the first month beginning after the date the order is issued (or, if later, the date specified in paragraph (4)); and
> >
> > (B) in the case of parts C and D, to monthly payments under contracts under such parts for the same one-year period . . . .

17. The special rules for applying sequestration to Medicare are instructive here. The only time that payments for individual patient care services are reduced occurs in the Medicare Part A and Part B programs.

18. By contrast, the sequester reductions for the Medicare Advantage (Part C) program and the Medicare Part D program do not relate to individual patient services at all. Rather, the reductions in those programs only apply to the monthly capitation amounts paid by the government to private plans such as Humana.

19. Congress provided no authority in the sequestration law to the President, the Secretary, or CMS—let alone to Medicare Advantage plans such as Humana—for such plans to pass the monthly capitation sequester reductions through to providers. Rather, as discussed in more detail below, the only guidance issued by CMS on this issue confirms that the parties' individual contracts control. In the Medicare Advantage program, private insurance companies bid with CMS for the companies to be paid a fixed monthly amount of payment, called capitation, based in part on the number of Medicare beneficiaries that enroll with the private insurance companies for the Medicare Advantage products that the insurers offer in the open market. The Medicare Advantage program reflects Congress's decision to create a private-market-based alternative to the traditional Medicare Parts A and B programs. Under the Medicare Advantage program, private insurance companies like Humana accept the full financial risk from the government for the provision of covered health-care services. The ability of these companies to profit depends in large part upon how well the private insurance companies bid for capitation contracts, manage the care needed by their enrollees, and anticipate events that could affect income and expenses.

20. The recently implemented sequestration was one of those risks accepted by Humana. Humana cannot unilaterally transmute the capitation reductions into separate and distinct reductions in the negotiated fee-for-service payments to providers. Capitation and fee-for-service are completely different concepts. Capitation is a risk-acceptance mechanism through which the plans receive payment regardless of what particular health-care services may or may not be rendered to their enrollees. By contrast, fee-for-service payment by CMS under Parts A and B is the polar opposite, paying providers directly, and only for specific episodes of care.

21. There is nothing in the sequester law permitting either the providers or the health plans to pass through their respective reductions to downstream contracted entities. The sequester law only dictates what the government pays. The recipients of these reduced payments have to absorb the decrease in reimbursement, just like every other private business that does business with the government. On the Parts A and B side the providers absorb the loss. On the Medicare Advantage side it is the health plans that must accept the reduced payments unless their contracts with providers permit the plans to pass such reductions onto providers. Humana cannot simply disregard the plain language of the Agreement and the sequestration law and decide instead to unilaterally push down to the Hospital all of the risk that Humana voluntarily accepted.

### CMS Has Confirmed that the Sequester Law Does Not Authorize Medicare Advantage Plans to Reduce Payments to Contracted Providers

22. On May 1, 2013, CMS issued an official memorandum confirming that the sequester law does not authorize Medicare Advantage plans such as Humana to unilaterally pass through the reductions to providers. Specifically, under the section of the memorandum entitled "Reducing Payments to Contracted Providers," CMS explained:

> Section 1854(a)(B)(iii) of the Social Security Act [42 U.S.C. § 1395s(a)(B)(III)] prohibits CMS from interfering in payment arrangements between [Medicare Advantage plans] and contract providers. The statute specifies that CMS "may not require any [Medicare Advantage] organization to . . . require a particular price structure for payment under such a contract[.]" *Thus, whether and how sequestration might affect [a Medicare Advantage plan's] payments to its contracted providers are governed by the terms of the contract between the [Medicare Advantage plan] and the provider.* We note that [Medicare Advantage plans] must follow the prompt pay provisions established in their contracts with providers and to pay providers under the terms of those contracts (see 42 CFR sections 422.520(b)(1) and (2)). . . .

CMS Mem. at 3 (emphasis added).

23. The decision by the government not to interfere with how Medicare Advantage plans pay providers is consistent with the notion that health plans participating in the Medicare Advantage program have agreed to take the benefits and risks of applying private-market practices. If a Medicare Advantage plan negotiates good terms with the government and providers, and manages care well, then the plan gets to keep the savings. This includes, without limitation, when the Medicare Advantage plan negotiates with the government for increases to the capitation paid by the government. Naturally, this potential upside also includes a potential downside to the Medicare Advantage plans when their capitation payment from the government is reduced. Either way, these fluctuations in the Medicare Advantage program are strictly a matter between the government and the plan. Providers are not a party to that process.

24. This lack of pass-through rights is not limited to the health-care industry. Sequestration affects government agencies in a variety of industries, including government contractors and subcontractors that provide various goods and services to the government. The sequestration law does not authorize government contractors to automatically pass along those reductions. In those situations, separate agreements between the prime contractor and the subcontractor govern the subcontractor's payment. To the extent sequestration reduces the government's payments under the contracts between the government and its contractors, payment to downstream vendors remains governed by the parties' contract. In other words, downstream payments are not dictated by the sequester law.

25. Likewise, any reduction by Humana in payments to the Hospital based on the notion that the sequester law mandates lower payments does not comport with the law. There is nothing in the sequester law that alters the terms of the Agreement between Humana and the Hospital.

**Humana Failed to Properly Pay for Services Rendered Under the Agreement**

26. Humana has failed to properly pay in accordance with the terms of the Agreement for inpatient hospital services, outpatient hospital services, freestanding hospital services, and hospital inpatient rehabilitation services rendered by the Hospital, starting with services rendered on or after April 1, 2013.

27. As explained above, the sequester law has no impact on the specified payment rate methodologies that Humana contractually agreed to use to calculate payment to the Hospital. The Hospital has the right to be paid in accordance with the terms agreed to by the parties. Humana's two-percent reduction violates the Agreement.

28. Instead of properly paying the Hospital for the services rendered to Humana's Medicare Advantage members, for services rendered on or after April 1, 2013, Humana has unilaterally reduced its payments to the Hospital by two percent. Humana did not even purport to implement this reduction pursuant to any specific contract language. Rather, Humana posted a notice on its website that indicated Humana would respond to the sequester by implementing an across-the-board reduction of two percent to Humana's payments to providers.

29. Nothing in the sequester law or in regulatory guidance implementing the law permits Humana to pass the government's spending reductions onto the Hospital, or otherwise modifies the payment terms that Humana agreed to in its privately negotiated contract with the Hospital for the provision of health-care services to Humana's Medicare Advantage members.

30. Humana's systemic underpayments therefore breach the Agreement.

///

///

///

///

## CAUSE OF ACTION

### (Breach of Written Contract Against Humana)

31. The Hospital incorporates by reference the allegations set forth above as though fully set forth herein.

32. The Hospital has performed all of the terms and conditions required of it under the Agreement relating to the Medicare Advantage services at issue, as set forth above, except as prevented or excused based on the conduct of Humana.

33. Humana materially breached and remains in breach of its contractual payment responsibilities, as set forth above.

34. As a direct and proximate result of Humana's failure to honor its contractual payment obligations, the Hospital was underpaid by Humana, and thus damaged by Humana, in an amount to be proven at trial.

35. Humana has acted in bad faith, been stubbornly litigious, and/or caused the Hospital unnecessary trouble and expense.

## JURY-TRIAL DEMAND

36. The Hospital demands a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, the Hospital respectfully requests that the Court:

A. Enter judgment in the Hospital's favor;

B. Award the Hospital compensatory and consequential damages in an amount to be determined by the jury;

C. Award a declaration that the parties' Agreement does not permit Humana to apply sequester reductions to contracted facilities covered by the Agreement;

  D. A permanent injunction prohibiting Humana from continuing to apply sequester reductions to contracted facilities covered by the Agreement;

  E. Award the Hospital its costs and attorney's fees under OCGA § 13-6-11 or as otherwise provided by law; and

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

F. Grant the Hospital such other relief as the Court deems appropriate.

Dated: June 17, 2015

Respectfully submitted,

By: _____
Robert L. Allgood (GA Bar No. 012675)
ROBERT L. ALLGOOD, P.C.
720 Saint Sebastian Way, Suite 120
Augusta, GA 30901
706.955.7452
706.955.7468 (fax)
rallgood@allgoodllc.com

*Counsel for Plaintiff*

*Of Counsel*:

Glenn E. Solomon (CA Bar No. 155674)*
Amanda L. Hayes-Kibreab (CA Bar No. 224403)*
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA 90067
310.551.8111
310.551.8181 (fax)
gsolomon@health-law.com
ahayes-kibreab@health-law.com

James F. Segroves (DC Bar No. 480630)*
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, NW, Suite 550
Washington, DC 20004-2141
202.580.7700
202.580.7719 (fax)
jsegroves@health-law.com

\* *Motion for Admission
Pro Hac Vice To Be Filed*

IN THE SUPERIOR COURT OF BARTOW COUNTY
STATE OF GEORGIA

| | |
|---|---|
| CARTERSVILLE MEDICAL CENTER, LLC, d/b/a Cartersville Medical Center,<br><br>Plaintiff,<br><br>v.<br><br>HUMANA EMPLOYERS HEALTH PLAN OF GEORGIA, INC., and its affiliates accessing the Plaintiff's agreement,<br><br>Defendant | Civil Action File No.: 15-CV-868 |

## ACKNOWLEDGEMENT AND ACCEPTANCE OF SERVICE

The undersigned, having due and legal authority to execute this document on behalf of the Defendant named above, does hereby acknowledge receipt of and accepts service of the Summons and Complaint filed in the Superior Court of Bartow County, Civil Action Number 15-CV-868. On behalf of Defendant, the undersigned further waives any requirement the Defendant named above be served by Judicial process in the manner provided in the Georgia Rules of Civil Procedure.

This 2nd day of July, 2015.

HUMANA EMPLOYERS HEALTH
PLAN OF GEORGIA, INC, ET AL.

BY: _K. Lee Blalack, II/deh_
AS ITS: _Counsel of Record_